The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having a matter of offensiveness before the Honorable of the United States Court of Appeals for the 4th Circuit, I'd like you to go out and get their attention. The Court is now sitting. Godspeed to the United States and His Honorable Court. All right, be seated please. All right, we'll begin with the only case we have today, South Carolina Ports Authority, NLRB. And I guess we start with you, Mr. Phillips. Good morning, Your Honors, and may it please the Court. Let me thank you in the first instance for the indulgence in allowing South Carolina and the Ports Authority to be heard in a special session. We recognize that as no small inconvenience to the Court, and we deeply appreciate it. Mr. Phillips, could you talk up just a tad, or maybe the mic? I don't know about the mic. See if I can move the microphone. Does that help any? Or I can screech. Let me see if that works. Is that better? Go ahead. Okay. Their hearing is much better than mine. As I was saying, the reason for the need for rapidity in this case is because there is a $1 billion terminal in South Carolina in Charleston that is operating at less than 10% of its capacity because of what is clearly a textual violation of 8b4b. That provision says it's an unfair labor practice for a union to threaten any person engaged in commerce, that would be USMX in this case, where an object of the union's coercive conduct is to force that person, USMX again, to cease doing business with any other person, and that would be the South Carolina Ports Authority. So the statute clearly unequivocally prohibits precisely what the union is doing in this particular case. And in the ordinary course, you would think that would be more than enough to say there ought to be an unfair labor practice issued and a cease and desist order that would follow thereby. To be sure, as a consequence of the containerization revolution of about 60 years ago, the United States Supreme Court has adopted some atextual exceptions and an atextual exception to what would otherwise be a straightforward textual interpretation of that statute, in which they've said if in the circumstances there is work preservation, then that will be deemed to be primary conduct, not secondary conduct, and that is secondary conduct that Congress was primarily concerned about eliminating. In order to determine whether or not there is, in fact, work preservation, there are two issues to be resolved. One is, does the action of the union preserve work as opposed to acquire additional work? And then the second one is, is the party who is ultimately being injured here capable of assigning the work? Does it have power or control over the assignment of the employment opportunities? And if the answer to either of those questions is no, then the defense is unavailable. Under NLRB principles, frankly, from way back, certainly extending through the Portland, Oregon litigation, the board has consistently taken the approach that the circumstances presented here would, in fact, constitute an unfair labor practice. And the administrative law judge candidly followed those precedents assiduously and concluded that this is a violation of 8B4B. What the board has done now is tried to shift completely the focus of the work preservation defense. And instead of looking at what, frankly, this court described in Marrowbone as the specific work involved that's in dispute, that is in the dispute between the two parties, in this case it would be in the fight between the South Carolina Ports Authority and the union, Charleston or the Leatherman Terminal, some combination of those two. If you look at that and you say, is this work preservation in that context, the answer is undoubtedly no. Mr. Phillips, let me ask this hypothetical and see what you think about it. Let's assume for a moment that South Carolina had not had this history of employing non-union labor at the South Carolina ports. They had just developed the port, constructed it, began to operate it, or at least were thinking about operating it. And you've got all the other things in place, the history of the union doing work all along the East Coast, Texas doing the kind of work that they traditionally do as longshoremen. And South Carolina then threatens to or says that they're going to hire non-union state employees to run this brand-new port and terminal. What's the result in that case? I think actually the result would be the same in that case, although I'll concede to you, obviously, Judge Diaz, that that's a significantly more difficult case. But again, it's hard to see how that is work preservation, at least with respect to . . . Well, why not? I mean, it's the very kind of work that the union workers are doing everywhere else. Everywhere else in Charleston. Not in Charleston. All along, this is an eight or nine state agreement. It applies. Let me make sure I understand that hypothetical. There are two other terminals in Charleston. Are those operating in the same . . . No, this is a brand-new port, brand-new terminal. Oh, nothing. Right. So let's pick a different state then, maybe. Right. Okay. So what's the result in that case? You'd have to go through the analysis. The first question is, is this work preservation? And what's your answer to that? I would say it's not work preservation. Why not? Because there was no work being done like that in the relationship between those specific parties to that particular problem. I mean, that suggests that the work remains static. The union could never preserve work no matter . . . that doesn't make any sense to me. No, but it doesn't end up that way because the union obviously has other weapons at its disposal. Okay. The question is whether you can engage in secondary boycotting behavior as the mechanism for trying to accomplish what you're trying to accomplish. The answer is the union should go to the state where this port's being adopted and work with the state and convince the state. In fact, it's the same .7A, the Article 7, Section 7 of the Master Agreement talks about with respect to South Carolina. Go do an analysis of the other ports and prove that it is more efficient to use the union's employees than it is to use the state's and convince the state that that's the way to go. That's certainly one . . . Don't use secondary boycotting. Right, no, that's certainly one option, but the contract gives the unions this other option, that if, in fact, they're being told that they can't work at a particular port or terminal because of the use of non-state employees, the contract, on its very terms, allows them to do exactly what they did here. Right, but even though you can do . . . even when what you're doing is permitted under your collective bargaining agreement, Springport has long held that if what you're doing violates the labor law, which this would, it's still a clear violation of 8B4B, then it's still subject to an unfair labor practice. So they entered into a contract that was meaningless? No, they entered into a contract that, under those circumstances, that authorized them to engage in what will effectively become a hot cargo provision. Yes, it is illegal. It's unenforceable in these circumstances. It doesn't say that you don't have other options that are available to you. But it just, you know, the problem is you can't contract away, especially when the third party isn't a party to the agreement. What if another state, Maryland, Texas, you pick it, decides that it's more efficient for them to employ non-union labor for the unloading and loading of the cargo that has heretofore been using labor workers, the ILA employees? Can they do that? Is that a violation of the . . . I mean, that would clearly be work, would create a work preservation situation, right? They're doing that kind of work. It's being taken away from them. They are allowed to take . . . What I'm saying is that the word preservation is demonstrated by some circumstance or threat that there will be a reduction in work, and they're trying to preserve it as opposed to the acquisition of new work. It seems to me that in the hypotheticals Judge Diaz raised, the entirely new port on the East Coast would probably not be preservation. Now, the question is whether there's another violation, because the preservation is part of the defense, as I understand. Correct. So we still don't have to . . . haven't addressed the unfair labor practice in the hypothetical. But I think he was raising that question to determine what is preservation or not, and it seems to me just as a matter of linguistics, in order to preserve something, there has to be some suggestion that you're going to be losing it, and you're technically against losing it. Whereas if there's something new, like a new port, then that's acquiring new work, and that wouldn't fit that aspect of the defense. Is that really where you were? You've said it far more eloquently than I could, Judge Niemeyer. But, no, that's exactly my position. If so, with a new port, you could never have a preservation union, preservation of work. Oh, no, there's plenty of instances in which you can have preservation work. There are situations . . . But in the hypothetical that Judge Niemeyer gave you, remember, I said this is a new . . . Oh, when you're talking about in a totally new situation? Yes, well, totally new in that this all goes, as Judge Diaz said, this is all along one port line. It's all considered by one side or the other as one working, one organizational area. But you say if you take a piece out of it, that's what I understand. There's a new piece coming in. And that's automatically just because it hasn't been before, it's not a continuation of work. Is that right? Right. What I would say is that it's not available to the union to engage in secondary boycotting activity as the mechanism for trying to obtain those new jobs that otherwise wouldn't have been available. Under the hypothetical, which wasn't spoken, in order to make it more analogous, you would have to start off with an unfair labor practice. Yes. And then focus on the defense of preservation. So that if we had the hypothetical going back to the new port, entirely new port, a new city on the East Coast, the question is, if the union engaged in an unfair labor practice, a secondary threat of neutral parties, then you could focus on whether it was the acquisition or preservation. But you still have to have an unfair labor practice. Right. There's no question about that. Well, but the problem is the contract doesn't divide it up that neatly, right? The contract speaks in broad terms of the right of these union workers to operate within the scope of the geographic region that it applies to. And it doesn't admit of any exceptions. So I don't understand. Well, except, of course, under that contract there have been exceptions for North Carolina, Georgia, and South Carolina for 60 years. It identifies the realities of the situation. And to this, as best I can tell, there's been no explanation as to why that applies. But on its face, it doesn't seem to admit of any exceptions. So why wouldn't the new port simply be preservation of work? Well, candidly, what you asked for was my opinion. My opinion is I think it would not be preservation of work. But you don't need to go there. I don't need to win that issue in order to win this case. Because what we're talking about here is a situation where for 60 years this has not been work done. The specific work that's being done in Leatherman's has never been done by this union. And, therefore, it cannot be preservation. And, second, the second part of the test is control. And, again, you've still got the same problem here. USMX does not control these positions. These positions are controlled by the Port Authority. And the NLRB conceded that if you look at it on the basis of what goes on at the port, which I would argue that both Marylbone and Pipefitter says that's the focus of the inquiry, then the appropriate control rests in the wrong hands. Well, I mean, the difference in the Pipefitter's case is you had a subcontractor who clearly did not control the work. Its only option was to walk away from the contract in order to satisfy the demands of the union. In this case, the shipping companies can walk away. Obviously, they do. But they can assign the work elsewhere. The subcontractor in Pipefitter's could not. So why don't the shipping companies here control the work? They control the containers. That's the work. Well, there's no evidence whatsoever that the Pipefitter's subcontractors refused to do work with the contractors. They could use a contractor or they could insist that that contractor use non-prefitted pipe. That was always an option. You can always go to another customer. If you accept the labor board's theory, they could have just shipped it to another customer. And if that's true, then they must have had control within the meaning of the statute. The court rejected that. It said, no, that's not the deal that was structured. And it's in the same way here. The deal that was structured is that the work being done by the states on state equipment is structured by the state that way. It was agreed to by the other side. We have a Fourth Circuit opinion from 1984 that affirmed, I think it was ILA 2, that affirmed on the merits both as to preservation of work and control in a situation that's at least, maybe not on all fours, but certainly with respect to the control of containers. We essentially said that the National Labor Board's finding with respect to control is correct. Why doesn't that bind us here? Because the finding of control in this case was different than the finding of control in that case. Because there you're talking about the more classic containerization situation where you do control the containers and who operates the containers. So ownership of the container itself actually dictates what work is being done, and therefore whoever owned the containers would have the control. Here we're talking about control of the jobs of moving those containers. And those jobs, according to the board itself, are completely controlled by South Carolina. What were the jobs at issue in the ILA 2 case? I'm having a blank. I can't remember. Well, it's a throwback to the old containerization cases. But what were the jobs? Were they any different than the jobs that were issued? Yeah, those were the classic loading and unloading and the location of loading and unloading and the court said in that context you can focus on the containers and where they move, which makes perfect sense in that context because most of the work that unions were doing in those days was loading and unloading containers. So anything that had to do with that could arguably fall within container ownership and therefore some sense of control. Here we're talking about jobs of moving containers and using state equipment for the purpose of moving containers. That's a very different situation. And, again, the board said if all you're focused on is who operates, who controls at this site in Leatherman's in Charleston, then it's clear that the right answer is it's the Port Authority. All right. I think you have some rebuttal. And next up I think is Mr. Spelman. Thank you, Your Honor. Well, I'm looking at the chart the clerk's given me and I thought it paralleled. What is your proposal here? I thought USMX was up following. Yes, USMX is up, Mr. Spelman. Is this wrong? I thought that the last board had the National Labor Relations Board following this. No, actually, I think you're right. I'm sorry. I think they have sort of a hybrid, mixed situation. Hybrid. I'm wrong. All right. Mr. Spelman, we'll hear from you. Good morning, and if it would please the Court, I'd like to start. USMX is in a unique position here. We are an intervener. There were two cases brought. The first case was brought by the NLRB against USMX, the International Longshoremen's Association, and Local 1422 of the ILA. That was an allegation that they had engaged in an agreement to boycott Leatherman. The ALJ and the board dismissed that allegation. We're shoulder-to-shoulder with the ILA on that one. We are also shoulder-to-shoulder with the NLRB on that first case. The second case concerns the ILA's lawsuit against USMX and two of its members that called at the Leatherman terminal, and that lawsuit went as follows. When USMX's member, Hapag-Lloyd, called at the Leatherman station, the ILA filed a $200 million lawsuit. When OOCL, that's Orient Overseas Container Lines, called at Leatherman, the ILA amended the complaint and added another $100 million. So it was a $300 million lawsuit. That suit is against two shippers and the association, right? Correct. Basically against the USMX carrier members who have the ability to call at Leatherman. We call it the New Jersey suit, right? That is correct. And it was brought in New Jersey, it was removed to the federal court, and then it was administratively dismissed. It can be brought back on the request of either party, but that lawsuit right now is stayed and dismissed. But what's interesting about that is the dispute between USMX and the ILA in that second action is a very narrow one, and I'd like to explain what that is. USMX readily admits that it's required to protect the ILA's jurisdiction under the terms of the master contract. I think, as Judge Diaz noted, the master contract's jurisdictional provisions are wide-ranging. They run from Maine down through West Texas. But in this case, there is a difference, and the difference is the existence of Article 7, Section 7. That provision was negotiated by USMX and the ILA in 2012 in response to an ILA demand that the ILA get all of the jobs being performed in Charleston, Savannah, and Wilmington, North Carolina. Those are the three ports in the three states that have state-operated stevedoring operations. Just to understand that, it's not all non-union. It's just the crane operators in those three states. That is correct. It's what's called the lift positions. They're owned by the state, and the operators are state employees. The rest of the stevedoring work, longshore work, is being done by union members. That is correct. So the overwhelming amount of the work in those three ports, including Charleston, is done by the ILA. And they do it very well. As you know, as we've admitted, we've worked together for decades with the ILA to ensure that the cargo is handled safely, swiftly, and economically in all those ports, including Charleston. There's no doubt about that. Mr. Spellman, just so I'm clear about this, though, in all other places except those three, the ILA does all of the work, including the crane operation and all of that. Do I have that right? That is correct. Not to correct you, Judge Diaz, but keep in mind, if you look at the master contract, even in the containerization agreement and the rules on containers, there are limitations. And it says work that historically or traditionally has been done. In addition, the master contract itself has another what I'll call limitation on the ILA's clerical jurisdiction. I think it's in Article 8.2b, which says jobs performed by state clerical workers will become the ILA's jobs if the state ceases doing it. In other ports, as you mentioned, Judge Diaz, in New York, in other ports, that clerical work is done by the ILA. It's theirs to do, and under the master contract and containerization agreement, they do it. In the Port of Charleston, however, because of Article 7, Section 7, there is a limitation, and USMX's position is that that limitation requires the use of the hybrid model, not only at Wando and North Charleston, where it's always been used. The ILA has never done the lift work. But USMX's position is that that work at Leatherman should also be done under the hybrid model. And that is the very narrow issue that USMX and the ILA now have. The question is, is the ILA entitled to all the jobs at Leatherman, or are they entitled simply to the lift jobs that they perform at Wando and at North Charleston, because the hybrid model applies to the entire Port of Charleston, just like we would say it applies to the entire Port of Savannah, and it would apply to the entire Port of Wilmington, North Carolina, if either of those two ports wanted to build a new terminal. And once again, the ILA's position, and we understand it very well, is that because it's a new terminal, they're entitled to all the work. And obviously, we disagree. One other thing I want to point out, not only is this a narrow issue, but the parties, and I'm talking about the ILA, Local 1422 and USMX, they've maintained the status quo in the Port of Charleston. All the work that's supposed to be done by the ILA at Wando and also at North Charleston has been done. There have been no disruptions. It's the status quo from top to bottom. Can I ask you about that section that you talked about? It talks about conducting a study to determine the appropriate business model. Correct. Then it says how that model could be altered to permit work currently performed by state employees. So does that contemplate a situation where a new terminal is then constructed? That's not work that's being currently done by the state employees. So why isn't the union entitled to that work? Well, let me answer the question about that study was an agreement reached by USMX and the ILA. What they wanted to do, they wanted to do a study to convince Charleston, Savannah, and Wilmington that the ILA workforce could do the work better and more economically than the state workers. That was the purpose of that section in subsection A. They had agreed to do the study. Everybody in this room knows that study was not done, but that was the purpose of the study. It was an agreement to try and get the ILA the jobs that they didn't have because of the hybrid work model. But it wasn't a concession that the union was never entitled to that work, or is it? Your view is that that was a concession, that contract be damned, they're not entitled to it. Yeah, our view of that is because the ILA has never done the lift work, in all the time that Wando and North Charleston have been operating, there's really no argument to be made to preserve it because it's always been state work. And, yes, that is USMX's position, that that work, because it's never been done by the ILA, is not capable of being preserved. That is absolutely correct. It would seem that there is at least an implicit acknowledgment by paragraph 7A that the work done in the ports, they use the word ports of Wilmington and Savannah and Charleston, is a hybrid model. Correct. And that the study would be done to try to persuade the ports to hire unions for the crane work. That is correct. And so it seems to me that's a pretty explicit acknowledgment that that has been the status quo historically. Obviously we agree. Well, that's right, I'm sure you are. All right. Your time is up. Why don't we hear Ms. Beard? Thank you, Your Honor. Thank you. Thank you. Good morning. I'm Heather Beard for the Labor Board. Sorry about before. I guess I was excited to get up here and talk. Well, we'll see how excited you are after we're done. I know. Okay. Well, I'm here to ask that you dismiss the petition for review that's been filed by the SCSPA. And I'm happy to talk about the work in question, what is work preservation, and what is the right of control. In this case, in this court, in the Supreme Court's precedent. Let me just ask you something as a structural matter. Who has the burden of demonstrating the preservation of work? That's a defense, isn't it, to a unfair labor practice? Sure. Sometimes it's referred to as the work preservation defense. But one thing to keep in mind is that in a case such as this where there is an allegation of an unfair labor practice, the general counsel does retain the burden of demonstrating that there's been an unfair labor practice. And so in this case. No, I understand. Yeah, correct. The unfair labor practice is the allegation that drives the case. Correct. But the question is, the unfair labor practice is an allegation that, or at least one of the unfair labor practices is the allegation that the New Jersey suit was secondary pressure on the court. Correct. And that that was an unfair labor practice. And there's a defense provided in the statute for, I guess, who bears the burden of showing that it was work preservation? Sure. Work preservation, and as it has been described as a defense, I'm okay with the fact that work preservation is a defense that would be demonstrated by, and in this case was demonstrated clearly by, ILA. And in this case, as Mr. Phillips said correctly, the Supreme Court has said that the work preservation defense, because, of course, of our statute, the National Labor Relations Act, which says that collective bargaining is to be encouraged, a union being able to preserve its own work is one of the more, a very important one of the National Labor Relations Act's purposes. And so in order for there to be work preservation, the first question the Supreme Court has said in the Pipefitter's case is you need to determine what is the work in question in order to determine is it being preserved. And the key question here that the board resolved in favor of, essentially in favor of ILA, is that the work to be preserved is the work across the East Coast. So if you think of it the way that I thought of it, if this is possibly helpful to the Court, is that there's sort of like a circle drawn around the East Coast and all the work on the East Coast. You know, I read this in your brief, and it sounds like, you know, in the antitrust laws, Section 1 is a monopoly provision, and monopoly provision is restraining trade in a relevant market. And the question is, what is the market? And that usually decides the whole lawsuit. In other words, if the market is the whole United States, you can bring everything in if it's a particular product. By using the whole East Coast, I don't know what it gains with the issue in this case, because the issue is created by the exceptions that exist in three ports and exemplified by Charleston. And the master agreement acknowledges the hybrid situation existing in those ports, and, of course, historically they've existed for a long time. So the question is, if that's the issue in the case, the hybrid situation, that's the whole focus of the union in this case, is to get rid of the hybrid situation. And so the question is, what goods is us to talk about the fact that the union has all the work in New York City, and the port is New York, and Newark, or whatever? Sure. Judge Niemeyer, if I can respectfully disagree that that's the way that this is framed, I think something that's extremely important is a footnote in the decision on page 29 of the board's decision in order. That's a footnote. The board adopted the judge's finding on this, and this is at page of the joint appendix, 1354. Okay. I'm sorry, 1353. Okay. And it's footnote number 32. There's a finding here that was not accepted to, and I'll read the last sentence of that footnote. The origin and rationale for this, and we're talking about the fact that there has been a hybrid model at those ports, is not clear from the record, but there is no indication the parties intended to carve out, individually or collectively, these three South Atlantic ports from the multiport bargaining unit. It is correct that Article 7A talks about a study, and descriptive, not normative, says that they're. . . I don't think carving out is the issue at all. I think it's not only is it not carved out, it is addressed. In other words, the master agreement defines the work, and it accepts the historical condition, and with respect to the particular issues before us today, it has 7A, and paragraph 7A, and it seems to me that paragraph 7A not only talks about the three ports, it talks about the hybrid model, and against the context that that's been the, for decades, that's been the model there. Sure. And also the notion that the employees there are controlled by the port authority. It says USMX and the ILA will use this study to meet with these port authorities, with these port authorities. That's the dispute, the three port authorities, in an effort to convince them to employ master contract bargaining unit employees. So it seems to me it's not excluded, it's not carved out, it's addressed. It's addressed explicitly as a condition existing and tolerated until this study is done, and they persuade the port to do something otherwise. So I don't get why we would talk about New York port, or we would talk about Maryland, Baltimore port, or whatever. It seems to me the issue in this case is the union clearly would like to have all the work in those three ports. There is a hybrid situation that has existed in those ports for years, and the question is are the current methods that are being used legitimate methods for preserving work, or is that acquisition of work? I think that's where we're really at in the core of this case. Sure. I would respectfully disagree. What the board found in this case, and what is supported by substantial evidence on the record, is that the definition of the work in question is set forth by the master contract starting with Article I, Section 3, which talks about the work on the entirety of the East Coast, and that was because of the enormous millions of job hours that were lost during containerization. And I would like to respond to something Mr. Phillips said in terms of the work at issue in this case. The work at issue in this case, the loading and unloading of containers, is at the heart, was at the heart of the bargain that was struck after containerization, so that the work preservation, the work of ILA, which had been significantly decreased, would be retained. And so when you take a look at Article 7 now has become, you know, this was not something that was accepted to in front of the board, but Article 7 now, 7A becoming such a big issue in the case, I understand what the language there says. We also had, I believe, Mr. Spellman say that there's a study that's talked about in Article 7A, which has never been completed, so I would suggest that Article 7A, in terms of what is the definition of the unit here, is not helpful, does not say that there is a carve-out, there is no exclusion, and in fact, the board's case law, and this, the Supreme Court has said, that the locus of a dispute is often very not the focus of what work preservation is. And when you have a diminishing amount of work that ILA is able to do, the board's finding was that in order to preserve it, again, the Leatherman Terminal is a new terminal. I think that Judge Diaz said it. I would agree with this, that to the extent that there is a contract and that ILA has preserved its work over all of these years with this good relationship with USMX, it would not then be able to, I think Mr. Phillips said, it would not be able to ever preserve the benefit of the bargain if there was ever to be a new terminal with work that comes up on the East Coast. And it really is this question of the East Coast being the bargaining unit, and every time a hybrid model, I think the evidence was ILA would like to preserve its unit and stop the expansion of the hybrid model. Is there an allegation that there's a loss of work? In other words, it seems to me to have preservation, there has to be some suggestion that if you lose this case, you're going to lose jobs that you have. Right, and the finding of that, with the board finding a decision. I'm talking about evidence. Oh, yeah, the evidence, yeah, absolutely, is that there. What is that? The evidence is that if you take a look at what the work. It all depends on what the work is. Correct. If I'm going to, yes, Your Honor, if the work is coast-wide work, any time there is a terminal built and it is using not all of the loading and unloading containers, it is not using ILA labor, that is a loss to ILA. That is a loss of work. But we never had it. They had it from their contract says they get to load and unload containers that are brought by carriers, that are brought by the carriers. In factually, in this case, the Leatherman terminal opened in April, and it was staffed by, the cranes were staffed by state employees. Correct. And Longshore staffed the unloading and loading and unloading otherwise. That's correct. That is what the situation is now. In other words, that Leatherman terminal has cranes that are being operated by the state. That happened right after it opened. That's correct. And we do have a, what happened here is a lawsuit was filed by ILA so that they could make sure. The lawsuit was filed against the shippers, not the port. Correct. Oh, absolutely, because the shippers know, based on the bargain that they signed, based on the contract that they signed, that the work on the East Coast, it goes to ILA. And if we have the hybrid model expanding, there's going to be less and less. Expanded. They talk about the hybrid model existing in the ports. They don't say on terminals in the ports. Correct. They say existing in the ports. And so the port of Charleston is a port that uses the hybrid model. That's what the contract alludes to. That's correct. I think I'd also like to point, however, this court, to the Bermuda container case from the Second Circuit, which took a look, the same containerization agreement at issue in this case before 2012, and it did find that the unit to be looking at in the work in question is the coast-wide unit here. Yes, but I don't see how that helps you. In other words, you can look at all the workers on the whole East Coast, and the question is this new terminal, you're not losing work at that terminal. You are trying to gain the work at that terminal. The terminal opened up with the hybrid model, and that's been existing for 50 years, 60 years, whatever the number is, and they opened it up with the same model. But obviously you're going to have some new workers doing that terminal because the other workers are still at the other two terminals under the hybrid model.  And that's fine if the court wants to operate that way. That's completely fine. The master agreement acknowledges that. That's my point. Okay. I see. I respectfully disagree, Judge Neumeier. Can I ask, so whether the master agreement acknowledged it or not, even if it wasn't in there, that was the reality on the ground, but it doesn't answer the question as to what the rights of the workers are under the agreement, and the rights of the workers under the agreement admit of no exception. I mean, no hybrid model. I mean, the question is, is this the work that they have traditionally done? And they might well have, you know, the USMX might well have a good case for waiver in that separate suit, but that doesn't address the question as to what the work is. And the Supreme Court has said you look at the work of the bargaining unit, not the work that's actually happening at the particular place in question. I 100% agree, Judge Diaz. That is absolutely correct, and that is the Board's position. And the Board said in its decision that to the extent there's any sort of contractual waiver argument, that is for, not for the NLRB to opine on the lawsuit, but the lawsuit that is currently pending is what is filed, and that is where any sort of argument like that can come in. Here, the key is there is no secondary objective that has been established under all of the evidence in this case. And without a secondary objective, there is no secondary boycott. The lawsuit that was filed that's protected under the First Amendment is only unprotected if it has an unlawful objective. And here there is no unlawful objective, considering not only this Court's precedent, but the Supreme Court's precedent, and particularly as well the right to control. We talk about who controls the work. I think my colleague from ILA will probably come up here and explain that there really is no work at the port. There is no work unless there is cargo, unless there is a container that is brought to a port. And so in the context of this case, that's why this case is not Marabone. That's why this case is not pipe fitters. This case in the marine industry is a case where the work is being brought, being controlled by USMX, who entered into a contract knowing that it controls the work, and said the work goes to ILA on the East Coast. And what's happened here is because the hybrid model has developed, for whatever reason, any time the hybrid model is built, instead of giving jobs to ILA, it is a loss of work. And to preserve the work in its bargaining context, ILA has filed a lawsuit pursuant to the containerization agreement's provisions that have been upheld for years that allow them to file a lawsuit to get damages. And so that's why we're here. Any other arguments about the business practices, any of those things, are not in front of the board right now. What's in front of the board is, was this an unfair labor practice? And here the board, according to the precedent of this court, in defining, it is key, Judge Niermeyer, I agree, defining the work in question here is key to the case, and the work in question is the loading and unloading of containers on the East Coast. And under that factual finding that the board made, which is entitled to deference, we would ask that you deny the petition for review. Okay. Thank you. All right, I think we have next in line Mr. Sheridan. We have quite a cast here. You know, I can't figure out, it's a sort of unholy trio here. The unholy trio. Yes, Your Honor. We have the union, we have the port, and we have the board, and we have the association. Yes, yes, it's quite a cast of characters. I guess it's indicative of the way the industry works. Judge Niermeyer, I wanted to follow up on what counsel from the board argues so eloquently. The work in this situation is cargo. It's somewhat theoretical and hypothetical to talk about a job assignment at any location if there's no cargo coming in. The way the longshore industry works is it's a casual industry. Longshoremen and longshorewomen are only hired when there's cargo. And in any port, they may be hired for different terminals on different days. Allegedly, there's no cargo because the union has threatened the association, the shippers, with a $300 million lawsuit if they frequent the terminal. And so the shippers take the position they can't risk that. They have to have good relations with the union, and so they bypass the terminal in an order and effort to bring pressure on the port. And the question is, that's the only way they can bring pressure on the port because the port's employees are the people that have to be kicked out, I suppose, in favor of the union workers. Your Honor, no one is being kicked out. The port's employees are working every day. We hear in the record, or we can take judicial notice, that the Port of South Carolina had the best fiscal year ever in 2022. What about the terminal? The terminal, I just heard right now, is operating at 10 percent capacity. Yes. That's their complaint. No, but the complaint is... That's a boycott. That boycott... The shippers are being threatened in order to boycott that terminal, and they say, in fact, it's happening. That boycott is a boycott by the carriers as a result of a lawsuit to enforce a valid work preservation in our agreement that has been in that agreement for decades. And that's the same work preservation agreement that we successfully enforced. Well, how do you say that when 7A acknowledges that the hybrid situation has existed in those three ports, and that's a historical fact? In other words... That acknowledges the historical fact, Your Honor. Yes. The shippers acknowledge that those ports have the hybrid model, and they also acknowledge that they should try to do a study to persuade the port authority in each of those three states to accept union workers. Yes, Your Honor, but that was the ILA, and that's why people are continuing to work in the port, and that's why they've had a successful port is the ILA has recognized... Leatherman Terminal is in that port. But they've had the most successful fiscal year ever last year with Leatherman Terminal operating at 10% capacity, which just shows what the port is trying to do. It's trying to increase its capacity. I mean, that's the American way. It wants to grab as much of the new cargo that's coming from the West Coast, the discretionary cargo that's growing by leaps and bounds, getting that to the Amazon warehouses, the Target warehouses. That's where the action is. If you can look at the public record, the Journal of Commerce, that's what the discussion is about, and they are increasing that, and they want their port to grab as much as it can. Other ports up and down the coast. Maryland is expanding. Other ports are dredging. Everybody's doing it. Can I ask a question? Yes. Under your theory of this case, the fact that USMX calls on these ports that are the hybrid model under the contract, that's a breach of the contract, right? I assume it's a breach of the contract. In order to not be disruptive, we're trying to enforce our contract in a non-disruptive, legal manner. We're just trying to ask for legal adjudication about the contract. Is it your position for 30, 40, 50 years the Shippers Association has been violating the master agreement? I think that's self-evident that they've been violating. Shame on us for not enforcing it, Your Honor. I agree. For 30 years ago, 20 years ago, did you make any complaint to them ever? Evidently not. I wasn't around, Your Honor. So, I mean, they agreed. So you've heard from somebody saying USMX, come back and say that you've agreed to something different. There's a dispute about what the contract meant. Honestly, the ILA and the USMX, the ILA thought they had an agreement about the ports, the South Carolina and Georgia. Evidently, it's not the case. If the Leatherman Terminal had never been built, the status quo would have just continued, right? I suppose it would have. What might have happened, they would have tried to persuade it, as they were able to persuade Virginia and Texas to use the bargaining unit.  That is true. Yeah, that is exactly true. No study was ever done. That happens a lot. You know, people say they're going to do things, and it just doesn't happen. But I'm sure they had the intention of doing it at the time. But just, Bermuda Container is the exact same situation as we had here. The Second Circuit saw that there was another terminal that not being operated. Now, Judge Niemeyer, when you focus only on the new place and don't look at where the cargo is being taken from, that's when you're focusing on the wrong situation with respect, because the cargo is the work. The people located in any particular place are not able to do work. And that includes people in the bargaining unit and outside the bargaining unit. So the shippers take the position that they can go to the other two terminals in South Carolina, and everything is going to be okay. They just can't go to the Leatherman terminal. I don't think that's their position. That's the ILA's position. Is that your position? Yes, that's the ILA's position. So it seems to me that that is inherently an acknowledgement that going to the other two terminals is perfectly fine. Yes, that's what we thought we agreed to. Because of Article 7A, Your Honor. As you said, Article 7, Section 7A. Article 7, Section 7B. That's what 7A talks about. Just a minute. I'm sorry. You argued just a few minutes ago that the shippers had been violating the master agreement for 30, 40, 50 years. Yeah. And then you say, we tell the shippers to go to the other two terminals, and everything will be fine. Yes, Your Honor, exactly. For 30, 40 years, they've been violating it. But as you said, the ILA did nothing about it, evidently. So in 2012. Because you have not asserted your rights, is that why they'll be fine if they go to the other terminals? Because in 2012, they kind of came to a head. And during the master contract negotiations, they said, listen, we want to enforce our rights here. There was some back and forth. I actually wasn't in the room for those negotiations. What came out of that was Article 7, Section 7A and Section 7B. And the ILA understood that those sections meant, okay, we'll preserve the status quo at the old terminals. But we understand there's a lot of plans in both Charleston and Savannah to build big new terminals. And we have to be able to enforce our contract, the promise that you gave to us, that you would not be taking your cargo outside the bargaining unit. And we thought that we had an agreement, okay, the master contract, as has always been written, will apply. So whatever Article 7, Section 7A talks about, red circling the terminals, keeping them status quo. Any new terminals anywhere on the coast will be treated equally, whether it be Maryland, whether it be New York, whether it be South Carolina. And then Leatherman was the first new terminal that came online after that that became an issue. And that is how we enforced it, simply the same as we had did with Bermuda container when they were trying to open a standard terminal. There is a container terminal in South Jersey, the Port of Salem, New Jersey. There still is one. And signatory carriers are not allowed to go there under the terms of the no self-contracting clause. Other non-signatory carriers go there. Non-signatory carriers go all sorts of terminals up and down the coast. But our bargaining partners know that they're not allowed to go there. They can't go to the Port of Chester in Pennsylvania. And we thought we had an agreement that unless things change or somehow that Leatherman was going to be one of those off-limit terminals. We have no illusions that we were going to grab the work there. This is simply not how it works. South Carolina said they didn't want to do that. The lawsuit mentioned nothing about getting the work. But what we wanted to do is the same thing we did in Bermuda container, keep the cargo from being siphoned off. I think your red light is on now. Okay. Thank you. Mr. Phillips. Thank you, Your Honor. I'll try to be brief. I have three basic points I'd like to make. First of all, it seems to me that the NLRB's basic position here is that containerization is a talisman that says that you don't have to worry about AB4B or any other details of this. We're talking about containerization and therefore the union is essentially free to do whatever it wants to do. First of all, that's not a position the board has ever taken prior to this litigation. And second of all, it's wrong. There is, to be sure, a treatment of containerization questions when there are core problems created by technology that have to be addressed, and the court's done that in the ILA cases, et cetera. But that is not the case here. This is not a technology case. It is conceded that the operations, the hybrid model operates precisely the same way at Leatherman's that it operated at the other two terminals in connection with Charleston. And so, therefore, you have to analyze this as a true classic examination of AB4B and then look at whether or not this is job preservation, which it's not. And then the question is whether the USMX has control over these jobs, which it's conceded that they do not. I think it's really important. The second point is really important to keep in mind. This is not a shred of evidence that a single piece of cargo has moved from any port in any way that would have affected any employment by any of the ILA members. The only diversions have been to the terminals in Charleston. And to the extent that there was one that would have gone to Wilmington, that, too, is another hybrid model. So nothing in this case has anything to do with the loss of any jobs to the union, which is, again, why this isn't preservation of jobs. And then finally, the easiest way to look at this case, Judge Niemeyer, you put your finger on it, it's Article 7, Section 7A and B, which says, look, whatever we agreed to over the last 60 years, we all recognize. Okay? We've got three ports that are operating. And remember, it's not terminals. It's ports. Take a study, go to those ports, and try to persuade them. Why? Because they are the ones who control these jobs. And if we control the jobs, then we cannot be the target of the secondary activity that's being undertaken by the union in this case. It's an unfair labor practice, and the court should declare it to be such. What's the relief you are requesting? Cease and desist order. By us or by the board? I'm not sure whether you can give us a cease and desist order. I think I'd have to get it from the board at the end of the day. But I think if the court makes clear the standards, it would come from the board. Well, we uphold the board, like any other group like this. It's factual findings, if there's substantial evidence to support them. But we also support its legal interpretation, as long as they are rational and consistent with the Act. Right? That's a little different than our usual standards of review. Yeah, except in this context. I mean, this is a pure question of law, I think, and the way the court looked at it. So rational and consistent with the Act. That's what it says about its legal interpretations. Don't you think that's a question of law? Well, I think the court would be on relatively infirm ground at this stage to go into a deferential decision-making, where the board has made no findings. I mean, you're talking about a pure question of whether there's preservation and whether or not there's control. And their analysis of that is not based on any kind of application of facts to law. They're saying you can look at the entire East Coast up through Texas to determine what is the appropriate unit. I would argue this court's already said that's not appropriate, period. And that's as a question of law. And where have we said that? And the board doesn't have another. I'm sorry? Where has this court said that? In Mariborne is where you said that is that the focus should be. And, again, Beifeder says the same thing. It doesn't say look beyond to all contractors. It says look at the specific dispute between the parties. That's the focus, which only makes sense because you're talking about a defense to what is otherwise clearly unlawful conduct. And it should be applied narrowly, and it should be applied in a way that protects, in this situation, entities like USMX that are neutral and not a party to this. There may be a broad preference for collective bargaining, but there's also a broad policy that wants disputes to remain between the primary disputants. And in this case, the collective bargaining agreement extends between USMX and the union. We're not a party to that. If they want to strike USMX directly and deal with them directly, that's fine. What they can't do is force USMX to boycott us. That's what the court needs to say. Let me just ask you one very collateral question. What's your position on the language of Section 7A and 7B? I think one of the charges is that that section in and of itself is an unfair labor practice. It's illegal. Right. It seems to me at cuts counter, in other words, if it is an unfair labor practice, then it has to be mandating the shippers to do something to create secondary pressure. But the question is, it's all permissive. I mean, it's a notification that this may occur. Right. And the circumstances, I mean, the court could agree. Right. No, it's not explicit. Our argument is that it's an implied contract, that it's an understanding between the parties as to what's required. And ultimately, as it ultimately played out, the union decided to enforce it precisely the way we think they meant to. It's trying to enforce it as a mandatory requirement that I'm not quite sure that the shippers, I guess, ignore the hybrid model, even though the hybrid model is acknowledged there. Right. I mean, there's no question. I just heard the allegations. It was surprising to me. I didn't see it in any of the papers, that it's the position of the union that shippers have been violating this master contract over the years. Well, I mean, I didn't read anything in their briefs that said anything along those lines either. And I think my friend said something along, you know, I guess that's what you'd have to basically conclude. But, again, it seems to me whatever was going on prior to the Article 7, Section 7 coming into existence after Article 7, Section 7, if that is not, in fact, the hot cargo clause for which an unfair labor practice should be applied, we think it is. The other side thinks it's not. But it's less important because the behavior of the union subsequent to it clearly violates 8B4B and, therefore, is still a violation of 8E as well. They don't have the authority to do secondary pressure the way they did in this case. All right. Thank you, Mr. Phillips. I guess we've heard from enough. I'm trying to think of anybody else. It's like at a wedding. Anybody have any objections to make it now? We'll come down and brief counsel. That's the tradition of the Fourth Circuit for years. We dropped it for a while during the pandemic. And I think all of us regret it. It's unique to the Fourth Circuit. So we'll come down and seal the system of justice with you. And if you'll adjourn court, sign it down. I just want to make a quick statement in terms of the death of a judge in the United States. And it's on this board.
judges: Paul V. Niemeyer, Albert Diaz, Diana Gribbon Motz